## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

**UNITED STATES OF AMERICA**

**V.**                                                                        **NO. 1:18-CR-70**

**CESAR AUGUSTO SALEMI-NICOLOSO,**
**KEVIN CARLOS DELGADO-MATA,**
**JAVIER ALEJANDRO MOLINE-BORROTO,**
**PAVEL ISAAC BURGOS-CORONADO,**
**JOSEPH NICOLE VERGARA-MORAN,**
**DANIEL GUSTAVO PENA-MORALES,**
**VALENTINA SYBREG CASTRO-BALZA**

### ORDER

This criminal case is before the Court on Javier Alejandro Moline-Borroto's motion to

suppress, Doc. #64; which was joined by Daniel Gustavo Pena-Morales, Doc. #65; Valentine

Sybreg Castro-Balza, Doc. #68; Pavel Isaac Burgos-Coronado, Doc. #69; Kevin Carlos Delgado-

Mata, Doc. #71; Joseph Nicole Vergara-Moran, Doc. #72; and Cesar Augusto Salemi-Nicoloso,

Doc. #86.

## I
## Procedural History

On June 20, 2018, Javier Alejandro Moline-Borroto, Daniel Gustavo Pena-Morales,

Valentina Sybreg Castro-Balza, Pavel Isaac Burgos-Coronado, Kevin Carlos Delgado-Mata,

Joseph Nicole Vergara-Moran, and Cesar Augusto Salemi-Nicoloso, were named in a five-count

indictment charging: (1) possession of device making equipment with intent to defraud, in

violation of 18 U.S.C. § 1029(a)(2) and § 1029(a)(4); (2) possession of a scanning receiver with

intent to defraud, in violation of 18 U.S.C. § 1029(a)(2) and § 1029(a)(8); (3) possession of 15 or

more unauthorized access devices with intent to defraud, in violation of 18 U.S.C. § 1029(a)(2)

and § 1029(a)(3); (4) aiding and abetting each other to use and attempt to use the access devices

to fraudulently obtain more than $1,000 in goods, services, and moneys; (5) and conspiracy to use such devices to fraudulently obtain such goods, services, and moneys.  Doc. #25.

On September 4, 2018, Moline-Borroto filed a motion to suppress all physical evidence and statements collected from a May 18, 2018, traffic stop.  Doc. #64.  Pena-Morales, Castro-Balza, Burgos-Coronado, Delgado-Mata,[1] Vergara-Moran, and Salemi-Nicoloso all joined the motion.[2]  Docs. #65, #68, #69, #71, #72, #86.  The Government responded in opposition to the motion on September 14, 2018.  Doc. #73.  Moline-Borroto filed an untimely reply on October 26, 2018.  Doc. #87.  On November 5, 2018, Pena-Morales, Vergara-Moran, and Burgos-Coronado joined the reply.  Docs. #88, #89, #90.

An evidentiary hearing on the motion was held November 7, 2018.  At the conclusion of the hearing, the Court took the motion to suppress under advisement.

## II
## Standard of Review

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights."  *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014).  Where evidence has been obtained through a warrantless search and seizure, "the government bears the burden of proving, by a preponderance of the evidence, that the search and seizure were constitutional."  *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).  In conducting a suppression hearing, a court is not bound by the Federal Rules of Evidence.  Fed. R. Evid. 104(a); *see United States v. Posado*,

---

[1] Delgado-Mata pled guilty to Count One of the indictment on November 7, 2018.  Per the terms of his plea agreement, the Government will dismiss the remaining counts against him "upon the conclusion of sentencing on Count One." Doc. #93 at 2.

[2] The joinders of Vergara-Moran and Salemi-Nicoloso were filed after the motions deadline.  Salemi-Nicoloso, however, sought and was granted leave by the Court to file an out-of-time joinder.  Doc. #85.  Vergara-Moran did not seek leave to file a joinder after the motions deadline but, in the interest of efficiency, the Court will consider the untimely joinder on its merits.

57 F.3d 428, 435 (5th Cir. 1995) ("We have consistently held that the rules of evidence are relaxed in pretrial suppression hearings.").

### III
### Factual Background[3]

At approximately 11:50 p.m. on May 18, 2018, Mississippi Highway Patrol troopers Gregory Bell, Matthew Minga, Andrew Beaver, and Steven Jones established a driver's license safety checkpoint on the northbound lane of United States Highway 45 alternate in Lowndes County, Mississippi. At the checkpoint, the officers stopped oncoming vehicles, checked driver's licenses and insurance, and made sure that every occupant of a car was wearing a seatbelt. Over the ensuing eighteen minutes, the officers stopped seven cars at the checkpoint. In order, respectively, the cars were stopped for approximate times of eighty seconds, thirty-seven seconds, thirty-four seconds, four seconds, twelve seconds, forty-five seconds, and eighteen seconds.

#### A. Initial Stops of the Defendants

At 12:08 a.m. on May 19, a Toyota RAV4 driven by Moline-Borroto, with Burgos-Coronado and Castro-Balza as passengers in the backseat, pulled into the checkpoint. Approximately thirty seconds after the RAV4 entered the checkpoint, a Volkswagen Jetta driven by Pena-Morales, with Vergara-Moran as a passenger, pulled into the checkpoint.

Minga approached the RAV4 and asked Moline-Borroto for a license and proof of insurance. Moline-Borroto provided Minga a temporary Florida driver's license and stated that the vehicle was a rental. After Minga asked Moline-Borroto who the passengers in the rear seat were, Moline-Borroto spoke to the passengers in Spanish and rolled down the rear windows.

---

[3] The Court bases its factual findings on the testimony at the evidentiary hearing; the exhibits admitted into evidence at the evidentiary hearing; and the transcript of the defendants' detention hearing, which was attached to the motion to suppress, *see* Doc. #64-1.

3

Burgos-Coronado provided a temporary Florida driver's license and Castro-Balza provided a Venezuelan passport which was missing an entry stamp.

Bell felt the seating arrangement was a "little strange" because, in his experience, "when there's an open front seat in a vehicle and there's a male passenger in there, usually the other male[ is] sitting up front." Bell testified that the seating arrangement, combined with the time of night and the absence of an entry stamp on Castro-Balza's passport, raised a concern that Castro-Balza was a victim of human trafficking or was otherwise being held against her will. At that point, Bell began to question Moline-Borroto about the car's travel plans so he could "better see what[ was] going on with that situation."

Bell testified that he asked Moline-Borroto: (1) where he was coming from and Moline-Borroto responded, "Mississippi;" (2) where he began his trip and Moline-Borroto responded, "Florida;" (3) to specify which part of Florida he was coming from and Moline-Borroto responded, "Miami;" (4) what was his destination and Moline-Borroto responded, "the hotel;" (5) what was his final destination and Moline-Borroto responded, "Memphis;" and (6) what the occupants of the vehicle were planning to do in Memphis and Moline-Borroto responded that they were going to visit his uncle from Venezuela. At that point, Bell asked Moline-Borroto for his uncle's name; Moline-Borroto paused and answered, "Jesús." When Bell asked for a last name, Moline-Borroto paused again and provided a single name, which Bell testified he could not remember. Bell then asked, "what was his mother or father's maiden name?" After Moline-Borroto "paused as if he didn't understand," Bell asked what his uncle's profession was, to which Moline-Borroto responded that his uncle was a "business owner." Bell then asked for Moline-Borroto's occupation, and Moline-Borroto responded he was in construction. Bell asked how long they were planning on staying in Memphis and Moline-Borroto responded, "ten to fifteen days." Finally,

Bell asked Moline-Borroto if he was taking a vacation, and Moline-Borroto responded that he "just took off."

During Bell's conversation with Moline-Borroto, Jones, who had been listening to the interaction, approached the Jetta. Jones asked Pena-Morales to provide a driver's license and proof of insurance and to state where he was coming from and where he was going. Pena-Morales provided Jones a Venezuelan passport and Vergara-Moran provided a temporary Florida's driver's license. Doc. #64-1 at 18. Pena-Morales "was speaking pretty broken English" but Vergara-Moran was translating for him. As translated by Vergara-Moran, Pena-Morales stated that they were heading to Tupelo, Mississippi.

During his conversation with Pena-Morales, Jones observed the Jetta had a Florida registration and concluded that "the dynamics of the vehicle were pretty similar, Venezuelan passport and Florida's driver's license."

Bell then asked Moline-Borroto if he was traveling with anyone. After a brief pause, Moline-Borroto responded that he was traveling with the occupants of the vehicle behind him. Jones and Bell then asked the same question to Pena-Morales, who responded that he and Vergara-Moran were traveling alone. Based on these inconsistent answers, which occurred less than five minutes into the stop of the RAV4, and the fact that Miami and Memphis are both "source cities," Bell suspected the occupants were engaged in narcotics smuggling and asked the cars to pull into the highway's median area.

### B. The Searches

After the cars pulled over, Bell obtained two consent to search forms from his vehicle. Bell told Moline-Borroto that he was going to request a consent to search and then walked over and

provided a form to Pena-Morales. According to a translator at the evidentiary hearing, the consent form, which was in Spanish, stated:

> In order to cooperate with the investigation that's being conducted by the Highway Patrol of Mississippi, I _____, give my voluntary consent to highway officer _____ and other people who may assist him in searching the vehicle _____. I am totally aware that this may include all of its contents and/or load in the vehicle, luggage, electronic devices, cavities, and/or modifications that may have been made to the vehicle after market. I understand perfectly that all of this is totally voluntary on my part and that I am giving my consent under no threat, promise, or any act of coercion, either mental or physical, on the part of the highway official. Additionally, I understand that I have the right to reject this voluntary search and/or stop the search at any time that I may wish so.

Bell left Minga to attempt to explain the consent form to Pena-Morales. Bell then returned to Moline-Borroto, provided him a consent form, and attempted to explain the form to him in English. Moline-Borroto seemed not to understand Bell's explanation, so Bell used a smartphone translation application to request consent to search. Eventually, Moline-Borroto told Bell he could "look wherever."

Pena-Morales signed the consent form but Vergara-Moran filled out the form's vehicle information.

Bell, who was also a K-9 Officer, then walked his drug dog, Apollo, around both vehicles to conduct an open air sniff test. During his sniff, Apollo alerted near the trunk of the RAV4. Apollo did not fully alert on the Jetta. Apollo did, however, exhibit an "obvious change of behavior" by the Jetta's right passenger door.

The officers searched the RAV4 and discovered items allegedly related to a credit card skimming scheme in a Wal-Mart bag placed under luggage and in a spare tire wheel well. Other items, including marijuana, were found during a subsequent search of the Jetta. The officers also found the RAV4 rental agreement, which reflected that Pena-Morales rented the vehicle.

**IV**

**<u>Analysis</u>**

The Fourth Amendment to the United States Constitution "requires that searches and seizures be reasonable." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). When a defendant's Fourth Amendment rights have been violated, the fruit of the poisonous tree doctrine requires suppression of "all evidence derived from the exploitation of [the violation], unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005). "Where evidence is found as a result of an illegal seizure, it must be suppressed even where it was not found as the result of an illegal search." *United States v. Thibodeaux*, 276 F. App'x 372, 381 (5th Cir. 2008) (collecting cases).

In this case, the automobiles were searched after the defendants were seized at the checkpoint. Therefore, as discussed in more detail below, the motion to suppress implicates two distinct issues: (1) whether the searches of the vehicles were reasonable; and (2) if the searches were reasonable, whether the justifications for the searches arose while the defendants were properly seized. In this regard, the Government contends that the searches of the vehicles were justified by the automobile exception to the warrant requirement and by consent. Doc. #73 at 7–8. The Government further argues that the doctrine of Fourth Amendment standing limits the extent to which all defendants but Pena-Morales may challenge the relevant searches.

### A. Standing

"[A] claimant alleging a Fourth Amendment violation must have a cognizable Fourth Amendment interest—a concept known as Fourth Amendment standing." *Barry v. Freshour*, 905 F.3d 912, 914 (5th Cir. 2018) (internal quotation marks omitted). Under this rule, a defendant asserting a Fourth Amendment violation has the burden to show "a justifiable, a reasonable, or a

7

legitimate expectation of privacy that has been invaded by government action." *Id.* "[A] defendant's standing depends on 1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized, and 2) whether that expectation of privacy is one which society would recognize as objectively reasonable." *Iraheta*, 764 F.3d at 461 (internal quotation marks and alterations omitted).

At the hearing, the Government argued that Burgos-Coronado, Vergara-Moran, and Castro-Balza lack standing to challenge the search of either automobile; that Moline-Borroto lacks standing to challenge the search of the Jetta; and that Salemi-Nicoloso lacks standing to challenge any aspect of the checkpoint stop.[4]

### 1. Castro-Balza, Vergara-Moran, and Burgos-Coronado

"[P]assengers who assert neither a property nor a possessory interest in the automobile that was searched, nor any interest in the seized property, have no legitimate expectation of privacy entitling them to the protection of the Fourth Amendment." *Iraheta*, 764 F.3d at 461 (alterations omitted). Nevertheless, a passenger in a seized vehicle maintains standing to challenge his or her individual seizure. *Brendlin v. California*, 551 U.S. 249, 258–59 (2007). However, presence during the stop of a vehicle does not alone grant standing to challenge a subsequent search. *United States v. Powell*, 732 F.3d 361, 375 (5th Cir. 2013). Rather, "[t]o gain Fourth Amendment standing to challenge the validity of a search—not the validity of the underlying seizure—passengers must continue to show a legitimate expectation of privacy in the area or item searched." *Id.* (internal quotation marks omitted).

---

[4] The Government does not challenge Moline-Borroto's standing to contest the search of the RAV4 or Pena-Morales' standing to contest the search of either vehicle; it therefore has waived these issues. *See United States v. Ponce*, 8 F.3d 989, 994 (5th Cir. 1993) ("[W]hen the government fails to challenge facts from which it could reasonably infer a defendant's standing, it waives the issue for purposes of appeal.").

Castro-Balza, Vergara-Moran, and Burgos-Coronado—the passengers in the vehicles searched—have asserted no interest in the vehicles or the items seized. Accordingly, while they have standing to challenge their individual seizures, they lack standing to challenge the searches of the vehicles.

### 2. Moline-Borroto

Moline-Borroto has asserted no interest in the Jetta or items in the vehicle. Accordingly, he lacks standing to object to the search of the Jetta.

### 3. Salemi-Nicoloso

At the hearing, Salemi-Nicoloso, who was not present in either automobile, claimed a property interest in a wallet seized from the Jetta. Salemi-Nicoloso, has not, however, offered any evidence or authority which would suggest that he had a reasonable expectation of privacy in the wallet, which was found in a car in which he was not present and in which he claims no interest. Accordingly, the Court concludes that Salemi-Nicoloso lacks standing to challenge any aspect of the searches or seizures. His joinder in the motion to suppress, therefore, is denied.

### B. Searches

"It is well-established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement." *Iraheta*, 764 F.3d at 462. As explained above, the Government contends that the searches of the vehicles were justified by the automobile exception and by consent.

### 1. Consent

Consent to search represents an "exception to the Fourth Amendment's presumptive warrant requirement." *United States v. Danhach*, 815 F.3d 228, 234 (5th Cir. 2016). To satisfy this exception, "the government must demonstrate that there was (1) effective consent, (2) given

voluntarily, (3) by a party with actual or apparent authority." *Id.* The parties do not dispute the existence of effective consent based on Moline-Borroto's statement that officers could "look wherever" or Pena-Morales' execution of the consent form. The parties also do not dispute that Moline-Borroto and Pena-Morales had apparent, if not actual, authority to consent to the search of the vehicles they were driving. *See United States v. Nunez*, 99 F. App'x 544, 545 (5th Cir. 2004) ("[A] person who has joint control over a vehicle may give valid consent to its search.") (citing *United States v. Crain*, 33 F.3d 480, 484 (5th Cir. 1994)). Rather, the issue here is whether the consents were voluntary.

The Fifth Circuit has recognized six factors that are relevant to deciding voluntariness of consent:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Perales*, 886 F.3d 542, 546 (5th Cir. 2018).

### a. Moline-Borroto

The first factor—custodial status—asks whether a reasonable person would feel that he was free to leave. *See United States v. Walker*, 706 F. App'x 152, 156 (5th Cir. 2017) (noting defendant "was not free to leave"). Bell testified that at the time Moline-Borroto was removed from the car (when the consent was given), he was no longer free to leave. Accordingly, the first factor weighs against a finding of voluntariness.

When considering the second factor—coercive police procedures—a court should consider whether the officer "used verbal threats or intimidation to obtain … consent or that an independent constitutional defect preceded or accompanied" the request for consent. *Perales*, 886 F.3d at 547.

10

The record reflects no threats or intimidation. Furthermore, as explained in more detail below, no independent constitutional defect preceded or accompanied the request for consent. Accordingly, the second factor weighs in favor of a voluntariness finding.

As to the third factor—extent and level of cooperation with police—the evidence shows that Moline-Borroto was cooperative throughout his interactions with the officers. This factor weighs in favor of the Government.

Regarding the fourth factor, while Bell never told Moline-Borroto that he could refuse consent, he provided Moline-Borroto a consent to search form which informed him of his right to refuse consent and attempted to explain the document to him. There is no evidence Moline-Borroto refused to read the document or was unable to do so. Under these circumstances, the Court concludes that the fourth factor—the defendant's awareness of his right to refuse consent—weighs in favor of voluntariness. *See United States v. Shabazz*, 993 F.2d 431, 438–9 (5th Cir. 1993) (affirming finding of voluntariness where form was given to defendant and "there was no evidence [defendant] 'didn't read it.'").

There is no evidence of Moline-Borroto's education or intelligence. Ordinarily, this would result in the fifth factor being deemed neutral. *See, e.g., United States v. Castellano-Acosta*, No. 2:18-CR-272, 2018 WL 3416436, at *6 (S.D. Tex. July 13, 2018) ("There was no evidence presented regarding Castellano-Acosta's education and intelligence, so this factor is neutral."). However, courts in the Fifth Circuit have considered a person's ability to understand English under the fifth voluntariness factor where the "language barrier inhibited [the defendant's] ability to act knowingly and intelligently." *United States v. Lopez*, 817 F.Supp.2d 918, 929 (S.D. Miss. 2011); *see also United States v. Barry*, 979 F.Supp.2d 715, 720 (M.D. La. 2013) (where language barrier existed, education and intelligence factor weighed against voluntariness).

11

Here, Moline-Borroto apparently struggled to understand Bell's verbal request to search and only gave consent after Bell used a translation application on his smartphone, a practice of which this Court has previously disapproved. *See United States v. Li*, No. 1:15-CR-102, 2016 WL 5407874, at *4 (N.D. Miss. Sept. 16, 2016) (fifth factor weighed heavily against voluntariness where there was "no evidence as to what was actually translated"). However, because Moline-Borroto was given a form in his native language which set forth his rights, the Court concludes that a language barrier did not inhibit his ability to act knowingly and intelligently. Accordingly, the fifth factor is neutral.

As for the final factor—belief incriminating evidence would be found—the evidence shows that the alleged contraband was found underneath a pile of luggage and hidden in an empty spare wheel well in the RAV4. Given that these items were not in plain view, Moline-Borroto "could have easily believed no incriminating evidence would be found." *United States v. Longoria*, 370 F. App'x 481, 486 (5th Cir. 2010). Accordingly, the sixth factor weighs in favor of voluntariness.

In sum, the first factor weighs against voluntariness; the second, third, fourth, and sixth factors weigh in favor of voluntariness; and the fifth factor is neutral. Although the Court is concerned about the use of the translation phone application, this concern is alleviated by the fact that Moline-Borroto was given a form in Spanish which stated his rights to refuse the search and was given time to review the form. The provision of this form,[5] combined with the absence of coercive tactics, Moline-Borroto's general cooperativeness, and the hidden contraband, convinces the Court that Moline-Borroto's consent was voluntary.

---

[5] While Moline-Borroto did not sign the form, this is not dispositive of the voluntariness inquiry. *United States v. Mata*, 517 F.3d 279, 283, 292 (5th Cir. 2008) (consent voluntary notwithstanding refusal to sign consent form).

### b. *Pena-Morales*

Pena-Morales, like Moline-Borroto, was not free to leave at the time he consented. Additionally, like Moline-Borroto, Pena-Morales was cooperative and not subjected to coercive procedures. Also like Moline-Borroto, Pena-Morales was provided a consent to search form in Spanish which he was given time to review, and which, unlike Moline-Borroto, he actually signed. The primary difference between the circumstances of the two consents is that, unlike in the RAV4, it appears some of the seized items in the Jetta were in plain view. This distinction, while relevant, does not alter the Court's analysis in any appreciable way. Accordingly, for the reasons above, the Court concludes that Pena-Morales' consent was voluntary.

### 2. Automobile exception

Under the automobile exception, "[l]aw enforcement may conduct a warrantless search of an automobile if (1) the officer conducting the search had probable cause to believe that the vehicle in question contained property that the government may properly seize; and (2) exigent circumstances justified the search." *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010) (internal quotation marks and alterations omitted). The doctrine allows for searches of "compartments and containers within the automobile so long as the search is supported by probable cause." *California v. Acevedo*, 500 U.S. 565, 570 (1991). "The scope of a warrantless search of an automobile … is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982). Thus, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825.

First, where, as here, a car has been stopped on a road, the exigent circumstances requirement is satisfied. *See Florida v. Meyers*, 466 U.S. 380, 381 (1984) ("[P]olice officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant."). Accordingly, the Court must decide whether the searches of the vehicles were supported by probable cause.

"[P]robable cause to search an automobile exists when trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband. Probable cause determinations are not to be made on the basis of factors considered in isolation, but rather on the totality of the circumstances." *Banuelos-Romero*, 597 F.3d at 767 (internal citations omitted). "[T]he subjective belief of the police officer regarding whether he has probable cause is irrelevant to the determination." *United States v. Steele*, 353 F. App'x 908, 910 (5th Cir. 2009) (citing *United States v. Cooper*, 949 F.2d 737, 744–45 (5th Cir. 1991)).

Generally, "an alert by a drug-detecting dog provides probable cause to search a vehicle." *United States v. Rodriguez*, 702 F.3d 206, 210 (5th Cir. 2012) (alterations omitted). Similarly, while a dog's "behavior change alone would not constitute probable cause," a court may consider the behavior change "when determining whether all of the relevant evidence establishes probable cause." *United States v. Muñoz-Nava*, 524 F.3d 1137, 1145–46 (10th Cir. 2008). Additionally, while insufficient on their own to establish probable cause, contradictory and evasive answers are relevant factors to the probable cause inquiry. *United States v. Flores-Manjarez*, 421 F. App'x 407, 410 (5th Cir. 2011). Finally, of relevance here, "tandem driving, though oftentimes explicable on entirely innocent grounds, may likewise indicate criminal activity." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991); *see United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1228

14

(10th Cir. 2008) ("Sufficient evidence that two vehicles are driving in tandem plus evidence that one vehicle contains contraband can provide probable cause sufficient to support arresting the driver of the other vehicle.").

Based on the drug dog's full alert, the apparent tandem driving, and the drivers' contradictory answers regarding whether the cars were traveling together, the officers had probable cause to believe that the RAV4 contained illegal narcotics. Additionally, the officers had probable cause to believe the Jetta contained evidence of a crime based on (1) the apparent connection between the vehicle and the RAV4, which was found to have contraband; (2) the drug dog's notable change in behavior; and (3) the contradictory answers provided by Pena-Morales and Moline-Borroto. *See United States v. Lopez-Garcia*, 238 F. App'x 402, 406 (10th Cir. 2007) ("Officer Owen knew that Mr. Ticas was driving in tandem with a similar Ford Taurus, that the other car was found with a hidden compartment containing cocaine, and that Mr. Ticas had a close or familial relationship with an occupant of the other car."). Accordingly, under the automobile exception, the officers were justified to search both vehicles without a warrant.

## C. Seizures

Having found that the searches were justified, the Court must determine whether either of the circumstances justifying the searches (the consent or probable cause), which occurred sometime between ten and fifteen minutes after the cars entered the checkpoint, arose while the defendants were properly seized.

### 1. Duration of checkpoints

"A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Edmond*, 531 U.S. at 37. However, "a legitimate, programmatic purpose … justifies a checkpoint stop made without any suspicion." *United States v. Machuca-Barrera*, 261

F.3d 425, 433 (5th Cir. 2001).[6]  Where such a stop is made, "[t]he scope … is limited to the justifying programmatic purpose of the stop …." *Id.*

There is no dispute that the purpose of the checkpoint at issue—checking licenses, insurance, and seatbelts—was valid.  *See United States v. Brugal*, 209 F.3d 353, 357 (4th Cir. 2000) ("[A] brief stop at a checkpoint for the limited purpose of verifying a driver's license, vehicle registration, and proof of insurance is a reasonable intrusion into the lives of motorists and their passengers even in the absence of reasonable suspicion that a motorist or passenger is engaged in illegal activity.") (collecting cases).  Rather, the question is whether the stop of the vehicles was properly limited in duration.  *See Machuca-Barrera*, 261 F.3d at 434–35 ("[I]t is not disputed that the primary purpose of the … checkpoint is to investigate immigration status.  Thus, we face only the question of whether the suspicionless stop of Machuca–Barrera was sufficiently limited in duration to pass constitutional muster.") (footnote omitted).

"[S]o long as the primary programmatic purpose of the checkpoint was [valid], the permissible duration of a suspicionless detention [must] be determined by objective factors, *not* by the subjective motivation or state of mind of the specific individual officers conducting the stop and related examination or questioning on the particular occasion at issue." *United States v. Jaime*, 473 F.3d 178, 183 (5th Cir. 2006).  "Within this brief window of time [a court] will not scrutinize the particular questions a[n agent] chooses to ask as long as in sum they generally relate to" the purpose of the checkpoint.  *Machuca-Barrera*, 261 F.3d at 433.  Thus, so long as the length of questioning is reasonable, it does not matter whether the agent asked questions unrelated to the purpose of the checkpoint, even if the agent had already determined that the purpose of the

---

[6] *Machuca-Barrera* involved an immigration checkpoint rather than a license/safety checkpoint such as the one at issue here.  However, its analysis heavily relied on general Fourth Amendment jurisprudence and *Edmond*, a non-immigration checkpoint case.  *See* 261 F.3d at 433.  Accordingly, the Court concludes that the analytical framework for immigration checkpoints set forth in *Machuca-Barrera* applies here.

checkpoint had been satisfied. *See Jaime*, 473 F.3d at 185 (continued questioning at immigration checkpoint after defendant confirmed her citizenship was permissible where total detention "was not excessive").

Ordinarily, "[t]he permissible duration of [a] checkpoint stop is … the time reasonably necessary" to effectuate the purpose of the checkpoint. *Machuca-Barrera*, 261 F.3d at 433. However, in the presence of an articulable, reasonable suspicion of wrongdoing, a checkpoint stop may "become a *Terry* stop." *United States v. Slater*, 411 F.3d 1003, 1006 (8th Cir. 2005). Thus, an "agent … may investigate … matters beyond the permissible length of the … stop if and only if the initial, lawful stop creates reasonable suspicion [of criminal activity] warranting further investigation." *Machuca-Barrera*, 261 F.3d at 434; *see United States v. Portillo-Aguirre*, 311 F.3d 647, 653 (5th Cir. 2002) ("A stop may not exceed its permissible duration unless the officer has reasonable suspicion of criminal activity."). Similarly, "[i]f an agent requests consent to extend the duration of a checkpoint stop, or if probable cause arises, then the stop's countable duration is measured only up until the time of consent or probable cause." *United States v. McMillon*, 657 F. App'x 326, 330 (5th Cir. 2016).

This Court has not found Fifth Circuit case law setting forth a reasonable length for a license/safety stop such as the one at issue here. However, the United States Supreme Court, in the context of immigration checkpoints, has approved detentions with an average range of between three and five minutes. *United States v. Martinez-Fuerte*, 428 U.S. 543, 547 (1976). This time period "include[s] the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention." *Machuca-Barrera*, 261 F.3d at 433.

A license/safety checkpoint, in contrast, does not require that an officer identify the passengers or inquire about the citizenship status of anyone in the car. Rather, as Bell testified, an officer need only confirm that everyone in a vehicle is wearing a seatbelt and then request and review the driver's license and the vehicle's registration—a process which video of the checkpoint here shows takes no more than ninety seconds. Even allowing for time to request consent to extend the detention, the time required to complete the purpose of a license/safety checkpoint is necessarily substantially shorter than the time necessary to complete the purpose of an immigration checkpoint. Accordingly, in the absence of reasonable suspicion, probable cause, or consent, a stop at a license/safety checkpoint may last "no more than a few minutes." *See Merrett v. Moore*, 58 F.3d 1547, 1552 (11th Cir. 1995) (approving license/registration check which lasted "no more than a few minutes"); *United States v. Bernacet*, 724 F.3d 269, 273 (2d Cir. 2013) (finding reasonable license checkpoint with duration of "approximately one minute per motorist").

## 2. The defendants' seizures

In this case, both cars were seized between ten and fifteen minutes by the time consent was given and probable cause arose. Thus, for the searches to have been proper, two things must have happened: (1) reasonable suspicion to prolong the detention of the vehicles must have existed during the first "few minutes" of the stops; and (2) such suspicion must have justified prolonging the stops for approximately ten minutes.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "police officers may briefly detain a person for investigative purposes if they can point to specific and articulable facts that give rise to reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (internal quotation marks omitted). Reasonable suspicion exists when the specific and articulable facts, "taken together with rational

inferences from those facts, reasonably warrant the search and seizure." *United States v. Broca-Martinez*, 855 F.3d 675, 678 (5th Cir. 2017). "[W]hile the officer must have more than a mere hunch that the person stopped is engaged in illegal activity, reasonable suspicion need not rise to the level of probable cause. Indeed, it requires only some minimal level of objective justification for making the stop." *Id*. (internal quotation marks and citations omitted). "The determination of whether [the officer] had developed a reasonable suspicion must be based on the totality of the circumstances and the collective knowledge and experience of the officer[s]." *United States v. Estrada*, 459 F.3d 627, 631–32 (5th Cir. 2006).

Once an officer detains a person based on reasonable suspicion, the officer's actions must be "reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). "This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id*.

Here, the Government argues that an initial extension of the detention period was justified by Bell's reasonable suspicion that Castro-Balza was a victim of human trafficking or was otherwise being held against her will. To this end, the Government contends that Bell's reasonable suspicion was supported by the time of day, the fact that Castro-Balza's passport lacked an entry stamp, and the fact that Burgos-Coronado was sitting in the back seat with Castro-Balza though the front passenger seat was empty. The Government further submits that the permissible detention period was then further extended by Moline-Borroto's statement that he was travelling between Memphis and Miami, two "source cities" for narcotics; the arrival of the Jetta; and the contradictory answers provided by Pena-Morales and Moline-Borroto.

19

With regard to the initial grounds for an extension, "[a]lthough traveling at an unusual time of day may not by itself give rise to reasonable suspicion, it is a permissible consideration." *United States v. Villalobos*, 161 F.3d 285, 289 (5th Cir. 1998). Similarly, courts have found relevant to the reasonable suspicion inquiry an occupied backseat combined with a vacant front seat. *See United States v. Beale*, 921 F.2d 1412, 1431 (11th Cir. 1991) (noting that when officers arrived at scene, "they observed [one person] seated in the driver's seat with [another person] seated directly behind him, even though the front passenger seat was empty"). Finally, this Court acknowledges the fact that "[m]any human trafficking victims are immigrants who initially undertake an illegal border crossing."[7] Terry Coonan, *The Trafficking Victims Protection Act: A Work in Progress*, 1 INTERCULTURAL HUMAN RIGHTS. L. REV. 99, 121 (2006). While none of these facts would be sufficient alone to support reasonable suspicion, the Court concludes that, taken together, they provided reasonable suspicion sufficient for Bell to extend the initial stop of the RAV4 to investigate whether Castro-Balza was a victim of human trafficking or was otherwise being held against her will.

Having developed reasonable suspicion regarding the detention of Castro-Balza, Bell was entitled to take actions reasonably related to dispelling this suspicion. *Brigham*, 382 F.3d at 507. To do this, Bell questioned Moline-Borroto about the circumstances of the trip. While the defendants fault Bell for pursuing this line of questioning rather than removing Castro-Balza from the car and questioning her directly, the Court concludes that inquiries about a vehicle's origin and destination are reasonably related to an officer's determination of the existence of human trafficking and, therefore, represented here a valid extension of the initial checkpoint stop.

---

[7] *See United States v. Lopez-Gonzalez*, 916 F.2d 1011, 1014 (5th Cir. 1990) ("[T]he district court properly took judicial notice that the Santa Maria area is notorious for drug trafficking and near the border with Mexico.").

While Bell was questioning Moline-Borroto, Bell learned that a second vehicle,[8] also from Florida and containing a person with a Venezuelan passport, had entered the checkpoint. Given his trafficking concerns, Bell was entitled to inquire whether the two cars were connected. *See United States v. Robert L.*, 874 F.2d 701, 704 (9th Cir. 1989) ("[T]raveling in tandem can be indicative of illegal smuggling activity."). When this inquiry produced contradictory answers from Moline-Borroto and Pena-Morales, Bell had reasonable suspicion of drug trafficking based on the apparent connection between the two vehicles, the inconsistent answers, and that the vehicles were coming from Miami, a "source city."[9] *See id.*; *United States v. Pack*, 612 F.3d 341, 359 n.12 (5th Cir. 2010) ("major" inconsistencies may "play[] a large role in establishing … reasonable suspicion"); *United States v. Sokolow*, 490 U.S. 1, 3 (1989) (travel from Miami contributed to finding of reasonable suspicion of drug smuggling).

Once an officer develops reasonable suspicion of narcotics smuggling, he may, within the scope of the detention, request consent to search the vehicle and to lead a canine—if it is currently on scene—for an open-air drug sniff. *See United States v. Shen*, __ F. App'x __, No. 17-11253, 2018 WL 4377273, at *3 (5th Cir. Sept. 13, 2018) (five minutes for open-air sniff appropriate); *United States v. Tijerina*, 272 F. App'x 378, 380 (5th Cir. 2008) ("Officer Diaz's questioning and request for consent to search was reasonably related in scope to the circumstances that justified the

---

[8] The initial length of detention of the Jetta is not challenged. Rather, the parties argued that the reasonableness of the Jetta's detention depends entirely on whether the RAV4 was properly detained. This Court is unsure whether this is true. Regardless, insofar as it appears Pena-Morales did not provide Jones a valid driver's license, an extension of the additional detention period was warranted. *See State v. Orr*, 745 N.E. 2d 1036, 1038 (Ohio 2001) (failure to provide license at license checkpoint justified "an additional two minutes or so" detention).

[9] Courts have become increasingly skeptical of a reference to "source cities" to justify reasonable suspicion. *See Vasquez v. Lewis*, 834 F.3d 1132, 1137 (10th Cir. 2016) ("[T]hat the defendant was traveling from a drug source city—or a drug source state—does little to add to the overall calculus of suspicion.") (internal quotation marks and alterations omitted); *United States v. Urrieta*, 520 F.3d 569, 576 (6th Cir. 2008) ("[T]ravel between population centers is a relativity weak indicator of illegal activity because there is almost no city in the country that could not be characterized as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center.") (internal quotation marks and alterations omitted). However, the factor remains relevant.

stop.") (internal quotation marks omitted). Accordingly, based on his reasonable suspicion, Bell was entitled to request consent to search the vehicles and to lead Apollo around the vehicles. Because these actions were authorized under *Terry*, the resulting consent and probable cause may be used to justify the searches.

## V
## Conclusion

For the reasons above, the motion to suppress [64] and the accompanying joinders [65][68][69][71][72][86] are **DENIED**.

**SO ORDERED**, this 28th day of November, 2018.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

22